809 F.2d 1232
 124 L.R.R.M. (BNA) 2508, 105 Lab.Cas. P 12,166
 William H. McCREEDY; Bernard Ashley; Augustin J. Aviles;
Thomas D. Cloudt; Patrick Dangelo; Donald B. Defibaugh;
Daniel S. DeRamus; Isaac Dick; Merlin Dyer; James
Gallagher; Frank M. Gidlin; Nancy Glover; Kenneth Gumm;
Harry L. Hayes; Billy J. Howington; Richard Lungler; Guy
Mannarelli; George Miles; Wendell Naylor; Dolores Nichol;
Ray Poll; Jay F. Carson; Ernest A. Zsebik; Wayne
Schmiermund; Art Powell; Robert A. Roth; James Ryan;
John S. Strasko; John Temple; William Ternes; Raymond E.
Wilson; James Winerbrenner; Conrad Zeck; Charles C.
VanAmburgh; Plaintiffs-Appellees, Cross-Appellants,
v.
LOCAL UNION NO. 971, UAW, et al., Defendants-Appellees,
The Bendix Corporation, (Heavy Vehicle Systems Group),
Defendant-Appellant Cross-Appellee.
 Nos. 85-3743, 85-3744.
 United States Court of Appeals,
Sixth Circuit.
 Argued Sept. 25, 1986.
Decided Jan. 23, 1987.
 
 Thomas H. Barnard, argued, David J. Somrak, Squire, Sanders & Dempsey, Cleveland, Ohio, for defendant-appellant cross-appellee.
 Kirk B. Roose, Oberlin, Ohio, for plaintiffs-appellees, cross-appellants.
 William P. Bobulsky, Betty Grdina, Bobulsky, Gervelis, & Grdina, Ashtabula, Ohio, Jordan Rossen, John Fillion, argued, Detroit, Mich., for defendants-appellees.
 Before MARTIN, GUY and NORRIS, Circuit Judges.
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 
 1
 This case presents two issues. First, what limitations period should be applied to a union's action to compel arbitration under section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185? Second, when did the employees' "hybrid section 301" cause of action accrue?
 
 I. History of the Case
 
 2
 The initial plaintiffs in this case are thirty-four former employees of Bendix Corporation's Heavy Vehicle Systems Group in Elyria, Ohio. They filed this action on August 5, 1983, alleging that Bendix had breached the collective bargaining agreement by not affording them transfer or preferential hiring rights when the Elyria plant closed. The employees also sued International Union UAW and its Local 971 alleging breach of their duty of fair representation. The Union filed a cross-claim against Bendix on August 17, 1984, seeking to compel arbitration on the underlying contractual dispute. Bendix moved for summary judgment on both claims on the ground that they were barred by the six-month statute of limitations provided for in section 10(b) of the National Labor Relations Act, 29 U.S.C. Sec. 160(b). The UAW moved for summary judgment against Bendix on its cross-claim. The district court granted Bendix' motion as to the employees, finding the hybrid section 301 action was barred by the statute of limitations. However, the district court granted the union's motion for summary judgment and ordered arbitration. The court was able to do this by borrowing the six year Ohio statute for contracts not in writing rather than applying the six month statute to the union's section 301 claim.
 
 
 3
 We find that the district court's application of such an extended statute to the union's action is contrary to federal labor policy and undermines the purpose of arbitration. The more appropriate limitations period is the six-month statute found in section 10(b) of the Act and it should have been applied to the union's action against Bendix. Thus the union's action against Bendix is also time barred.
 
 II. Facts
 
 4
 Bendix and the UAW were parties to a collective bargaining agreement covering the Elyria, Ohio plant and effective from July 30, 1980, to July 31, 1983. Paragraph 154 of that agreement provided that if the company elected to move a department, line, or group, out-of-work employees could elect to be transferred to the new plant with their seniority intact and would be accorded preference in hiring on the conditions that the employees at the new plant were represented by the UAW and/or there was no certified bargaining unit which would result in the laying off of seniority employees. Article IV of the agreement outlined a grievance arbitration procedure which contained no specific time limits, except in the final step. There, it provided that "[i]f notice in writing of intent to appeal to arbitration is not received by the answering party within seven (7) calendar days after receipt of the final position, as above, the grievance shall be considered settled."
 
 
 5
 In March, 1982, Bendix announced that it would end production at the Elyria plant for economic reasons, and move the lines there to other Bendix plants. On May 2, 1982, at a meeting held for union employees, Bendix announced tentative plans to move the facilities to Newport News, Virginia.
 
 
 6
 On June 4, 1982, the UAW and Bendix met and negotiated a Plant Closing Agreement which defined the rights of the Elyria plant workers upon layoff and made no mention of transfer or preferential hiring rights. It also contained two statements which appear to contradict each other. It provided simultaneously, "[t]he terms of the collective Bargaining Agreement will continue to be observed except as modified by the terms of this Agreement," and,
 
 
 7
 [t]hese provisions resolve in full the matter of rights and benefits for terminated and laid off employees of the Company and represent the total agreements reached by the parties. The parties' collective bargaining agreements and all supplemental agreements dated July 31, 1980, are hereby superseded and terminated and of no further force and effect, as of July 31, 1983.
 
 
 8
 The agreement contained no specific reference to the survival of paragraph 154. The union membership ratified the Plant Closing Agreement in June, 1982.
 
 
 9
 In its brief, the union contends that even after ratification of the Plant Closing Agreement, it understood paragraph 154 to have remained in effect. Bendix states that preferential hiring and transfer rights were discussed during the negotiations. However, it argues that these rights had been bargained away in the course of negotiations and thus were intentionally left out of the Plant Closing Agreement.
 
 
 10
 On June 18, 1982, the president of the local UAW wrote to Bendix. In the letter, he requested that the union be given the opportunity to discuss keeping the jobs in Elyria or moving people pursuant to paragraph 154, in light of the company's decision not to move the work to Newport News. On June 25, 1982, Bendix responded with a somewhat ambiguous letter which stated that the issues raised by the UAW had been fully discussed during the negotiations surrounding the Plant Closing Agreement. Bendix alleges that this letter constituted notice to the UAW that it did not consider itself bound by paragraph 154. The UAW did not see this as a denial of its grievance.
 
 
 11
 On August 5, 1982, three months before he was laid off, William McCreedy submitted an application to Bendix asking for transfer or preference in hiring wherever the Elyria facilities might move. Bendix returned the application and enclosed a letter which stated that "the recent closing agreement ... [did] not contain provisions for transfer or hiring to another location." It also said, "[a]lthough HVSG has announced its intention to relocate from Elyria, a final determination as to the new site has not yet been made, consequently your application is not timely as well as not appropriate." Thus, McCreedy was told that his request was too early, and was simultaneously given some indication that regardless of when he submitted the application, Bendix may not honor it.
 
 
 12
 As of August 20, 1982, Bendix told the UAW that no final selection had been made between several alternative new plant sites. On October 26, a note was posted at the Elyria plant announcing that the operation would be "absorbed" into other existing facilities in London, Ontario, Charlotte, North Carolina, and Frankfort, Kentucky, though which products would go to which plants was still undetermined. Both London and Charlotte were UAW plants, meaning that if several other conditions were fulfilled, paragraph 154 could apply. The other conditions were 1) new jobs or a substantially new facility had to be created so preferential hiring or transfer could be accorded, 2) Elyria employees had to be out of work as a result of the movement of work, and 3) entire lines or departments must have been relocated.
 
 
 13
 McCreedy was laid off on October 29, 1982, and he and Bernard Ashley filed grievances on November 1, 1982, asking for transfer to the other plants and stating that if not accorded, a violation of paragraph 154 would occur. Bendix took the position that the layoffs were due to a lack of work and not to redeployment of the work.
 
 
 14
 A few days later McCreedy and eleven other employees applied for "transfer and or preference in hiring in Charlotte, North Carolina or any plant that the Elyria facilities are moving to." The next day five more employees filed grievances, stating that they were "aggrieved because the company did not notify us of moving out work and closing the plant, and did not advise us of our rights under the contract, paragraph 154." The company answered all of these grievances and applications in a letter written on November 11, 1982. In the letter they described the grievances and referred to their letter of June 25, 1982, as defining their position on the matter. It is this letter that the district court held constituted the notice and thereby the accrual of the plaintiffs' claim.
 
 
 15
 On November 17, 1982, (within the seven day period allowed for the UAW to appeal an unsettled grievance), McCreedy wrote a letter to four levels of the UAW. In it he recited paragraph 154, pointing to its specific language and intent and expressed uncertainty as to whether it would afford transfer to all locations or just one. He also requested that the UAW research the facts surrounding the company's rejection of his August, 1982, transfer application as "untimely and inappropriate", and asked that if necessary the UAW seek arbitration to secure the rights guaranteed by the original contract. Thus, it is not true, as Bendix alleges, that the plaintiffs made no effort to have their grievances appealed to arbitration. However, the union did not seek arbitration within the seven days provided. John Mando, assistant director of UAW's Bendix department replied to McCreedy in a letter dated November 29, 1982. In it he stated that he did not believe McCreedy's rights had been violated, quoting the language from paragraph 154. Thus, as of the end of November, 1982, McCreedy had been told that his claim was not currently arbitrable but he had been led to believe that it might become so if and when the lines or departments from Elyria were relocated to other UAW plants. McCreedy replied to Mando on December 9, 1982, complaining that local union officials were not aggressively filing grievances for plaintiffs, because the union apparently thought he had nothing "to grieve about."
 
 
 16
 In January 1983, plaintiffs McCreedy, Ashley, Dick and Zech travelled to the Charlotte, North Carolina Bendix plant where they saw what appeared to be preparation for new construction, leading them to believe that some of the Elyria jobs might be moved there. Upon his return, McCreedy wrote to UAW President Fraser, asking him to look into the situation. Vice-President Komer answered the letter on February 8, 1983, stating that McCreedy's layoff was unrelated to any product relocation, but due to reduced volume. She also stated that so little work had been transferred to Charlotte, and so many laid off workers there had recall rights that the plaintiffs had no rights under paragraph 154, and indicated that the bulk of the Elyria plant work was scheduled to be transferred to the Frankfort, Kentucky plant whose workers were represented by another union. Thus, she stated that there was no basis for his complaint.
 
 
 17
 The dates here become significant because unless the statute of limitations was tolled, February 5, 1983, is the date six months before the plaintiffs filed their action. Thus, absent tolling, the cause of action must have accrued later than this date to be timely. If, on the other hand, November 18, 1982, is the date on which the plaintiff's claim accrued, then they must have filed their action no later than May 18, 1983, to have fallen within the time provided for hybrid section 301 actions.
 
 
 18
 On February 19, 1983, an article in the Charlotte Observer reported a Bendix news release that a 90,000 square foot, $2 million addition to its Charlotte plant was scheduled for groundbreaking that week. The article implied that the 100 new jobs which would be created were due largely to the transfer of work from Elyria. It stated that the jobs would be filled by transferring employees from Ohio, recalling laid-off workers, and hiring new ones. (Quoting Richard Minishbauer, Bendix' Charlotte employee relations manager.) The 100 jobs were to be fully staffed by one and a half years from then, while limited production was to begin by May 1983. Had the employees filed their hybrid section 301 action within the next, almost three months, it still would have been timely.
 
 
 19
 An article in the June/July 1983 issue of the Bendix Automotive Reporter detailed the expansion and consolidation of the HVSG, stating that it involved the expansion of or addition to many plants, including those in Frankfort, Kentucky, London, Ontario, and Charlotte, North Carolina. The article clearly stated that this involved the relocation of work from Elyria and that the major programs would be completed by September 1983.
 
 III. The employees' hybrid section 301 claim
 
 20
 There is no question that the hybrid section 301 action brought by the plaintiffs is governed by the six-month statute of limitations borrowed from section 10(b) of the National Labor Relations Act, 29 U.S.C. Sec. 160(b). Delcostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). Thus, as to the employees' claims, we have before us only the question of when the limitations period began to run.
 
 
 21
 This Court has held that "[a] claim accrues under section 10(b) when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." Adkins v. International Union of Elec., Radio & Mach. Workers, 769 F.2d 330, 335 (6th Cir.1985) (citing Shapiro v. Cook United, Inc., 762 F.2d 49, 51 (6th Cir.1985)). A district court opinion has stated that this accrual period applies "... even if some possibility of nonjudicial enforcement remain[s]." Rose v. General Motors Corp., 573 F.Supp. 747, 752 (S.D.Ohio 1983).
 
 
 22
 Here, the district court found that the date of accrual of the plaintiffs' cause of action against Bendix and the UAW was November 18, 1982, seven days after the denial of their grievance. In so finding, it stated that it was at that point that the plaintiffs knew or should have known that there was a dispute with Bendix over their rights under the collective bargaining agreement. The court in Rose had found that in a section 301 action it is appropriate to consider that a claim accrues against the company when it accrues against the union. The Third Circuit has held, and we agree, that the employee's hybrid cause of action may arise when the union takes an unequivocal position that it will not seek arbitration. Federation of Westinghouse Indep. Salaried Unions v. Westinghouse Elec. Corp., 736 F.2d 896, 902 (3d Cir.1984). That court pointed out that the union's cause of action may arise at a different time, making the maximum limitations period twelve months. Id.
 
 
 23
 Here, though plaintiffs had filed grievances on previous occasions, they were on notice no later than November 11, 1982, that Bendix did not intend to honor paragraph 154. The employees' claim arose on November 18, 1982, seven days after they received Bendix' letter. Because it was not filed within the six-month period established in DelCostello, this action was therefore untimely. We affirm the district court's dismissal of the employees' claim.
 
 
 24
 IV. The limitations period applicable to the Union's section
 
 301 action to compel arbitration
 
 25
 There remains the question of the limitations period to be applied to the UAW's cross-claim against Bendix to compel arbitration. This is a question of first impression in this Circuit, though other circuits have dealt with the issue recently. Bendix argues, and we agree, that in light of the holding in DelCostello and pursuant to the stated purposes of federal labor policy, the six-month period found in section 10(b) of the National Labor Relations Act is the most appropriate statute of limitations to be applied in a union suit against a company to compel arbitration under section 301.
 
 
 26
 A union's cause of action to compel arbitration arises when the employer takes an unequivocal position that it will not arbitrate. Westinghouse, 736 F.2d at 902. Because here the Union took no appeal from Bendix' denial of the employees' grievances, we hold that the union's claim also accrued on November 18, 1982, seven days after the claims were denied.
 
 
 27
 As is frequently the case with federal law, Congress did not create a statute of limitations to apply to actions brought under section 301. In order to give a definite period of life to a claim, the courts have traditionally borrowed the most closely analagous state statute of limitations. Recently, however, some courts have found that under certain circumstances state statutes prove inadequate to effectuate the purposes of federal labor law, and they have chosen instead to borrow federal statutes more analogous to these purposes. In so doing, they have created something resembling a national labor relations common law. The need for uniformity has also been a major consideration, and was a foundation of the argument in DelCostello. There, the Court clearly distinguished International Union, UAW v. Hoosier Cardinal Corp., 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966), reasoning that when a case involves "those consensual processes that federal labor law is chiefly designed to promote--the formation of the collective agreement and the private settlement of disputes under it," national uniformity is of greater importance. DelCostello, 462 U.S. at 162-63, 103 S.Ct. at 2289-90.
 
 
 28
 Even before DelCostello we had reached this conclusion in Badon v. General Motors Corp., 679 F.2d 93 (6th Cir.1982). There we stated that "[w]here the parties have contracted to settle claims among themselves, their final decisions should not be exposed to collateral attack for long periods but should become final rather quickly." Id. at 98. Actions to compel arbitration present just such situations. Arbitration is a policy at the heart of federal labor law, which has been, and will continue to be greatly favored by the courts. To delay its occurrence by applying a six or twenty year state statute of limitations applicable to oral or written contracts would defeat its purpose--the speedy resolution of disputes. See Hoosier Cardinal, 383 U.S. at 707, 86 S.Ct. at 1114. "It is not arbitration per se that federal policy favors, but rather final adjustment of differences by a means selected by the parties." Badon, 679 F.2d at 98 (citing U.M.W. v. Barnes & Tucker Co., 561 F.2d 1093, 1096 (3d Cir.1977)). Here, grievance arbitration procedures were written into the collective bargaining agreement, yet Bendix failed to abide by them. At that point it was the responsibility of the union and the employees to seek external remedies.
 
 
 29
 Unlike the claim involved in Hoosier Cardinal, an action to compel arbitration is not readily analogous to a traditional breach of contract suit where damages are sought. Unlike most contracts, collective bargaining agreements establish a grievance resolution process in order to insure a smoothly functioning labor-management relationship. Efficiency is a fundamental concern of both union and management, and the substance of these claims should be heard by a court only when the internal dispute resolution process totally breaks down. Badon, 679 F.2d at 97. Here, the union seeks only to enforce the grievance and arbitration procedures so central to the smooth operation of the process. However, it appears the union failed to move quickly enough.
 
 
 30
 The Court in DelCostello discussed the considerations relevant to choosing a limitations period, making it clear that the six-month period present in section 10(b) of the NLRA was the product of a purposeful balancing of interests.
 
 
 31
 In Section 10(b) of the NLRA, Congress established a limitations period attuned to what it viewed as the proper balance between the national interests in stable bargaining relationships and finality of private settlements, and an employee's interest in setting aside what he views as an unjust settlement under the collective-bargaining system.
 
 
 32
 DelCostello, 462 U.S. at 171, 103 S.Ct. at 2294 (citing United Parcel Service v. Mitchell, 451 U.S. 56, 70, 101 S.Ct. 1559, 1568, 67 L.Ed.2d 732 (1981) (Stewart, J., concurring)). Though in this case the union is the party in interest rather than the employee, the union exists for the benefit of employees and thus the interests to be balanced are the same. Here, as in Mitchell, we must consider the undesirability of suspending the grievance procedure and leaving the arbitration process in limbo for an extended period of time. 451 U.S. at 64, 101 S.Ct. at 1564-65. Just as the employee's unfair representation claim is a creature of labor law, so too, we believe, is a union's action to compel arbitration. See Mitchell, 451 U.S. at 63, 101 S.Ct. at 1564.
 
 
 33
 Recently, three courts have considered the limitations question in actions to compel arbitration and all have adopted section 10(b)'s six-month statute. In Federation of Westinghouse Indep. Salaried Unions v. Westinghouse Elec. Corp., the Third Circuit took its lead from the Supreme Court in DelCostello and held that the section 10(b) statute of limitations should be borrowed to apply to actions to compel arbitration under section 301. 736 F.2d 896. It stated that the application of a six-year state statute stretches out industrial disputes far longer than most recent cases have deemed desirable. It also pointed to Justice Brennan's footnote twelve in DelCostello which paved the way for the application of the six-month period to "straight" 301 actions. Id. at 901. That footnote read in part:
 
 
 34
 The suits ... here ... are amalgams, based on both an express statutory cause of action and an implied one.... We need not address whether, as a general matter, such cases should be treated differently; even if this action were considered as arising solely under Sec. 301 of the [L.M.R.A.], ... the objections to use of state law and the availability of a well-suited limitations period in Sec. 10(b) would call for application of the latter rule.
 
 
 35
 DelCostello, 462 U.S. at 159, n. 12, 103 S.Ct. at 2287, n. 12. This footnote, the court held, was a clear signal that the applicability of Hoosier Cardinal to section 301 suits was now an open question.
 
 
 36
 The Third Circuit found in Westinghouse that the application of the extremely short Pennsylvania statute governing actions to confirm arbitration awards would unnecessarily shorten the time during which parties to a collective bargaining agreement may, after exhaustion of in-house grievance steps, attempt an informal resolution of disputes. It also pointed out that grievances often involve activities which may amount to unfair labor practices, thus making it logical to apply the same statute of limitations to both. 736 F.2d at 902.
 
 
 37
 The Ninth Circuit held the same in Teamsters Union v. Great Western Chemical Co., 781 F.2d 764 (9th Cir.1986). It chose to apply the six-month statute of limitations of section 10(b) to an action to compel arbitration as opposed to a four year or 100 day state statute. It found the former too long, and stated that "[a] long period of controversy and conflict can be a serious burden, both for the grievant and for the management, and can poison the relationship between the contracting parties that the contract was designed to establish and preserve," id. at 766, and it found that a short period for invoking judicial help was warranted. Id. However, it stated that 100 days was too short in that it unnecessarily shortened the time during which the parties could work informally toward dispute resolution. Id. at 767.
 
 
 38
 The Eleventh Circuit also applied the six-month period to a union's action to compel arbitration in International Ass'n of Machinists v. Allied Prod. Corp., 786 F.2d 1561 (11th Cir.1986). It based its decision primarily on the fact that 10(b) provided a closer analogy than the closest state statute, and followed its earlier decision in Samples v. Ryder Truck Lines, Inc., 755 F.2d 881 (11th Cir.1985). In Samples the court adopted the 10(b) period for a straight 301 action brought by a union to enforce an arbitration award.
 
 
 39
 In all of these decisions the policies involved were the same, and in each, the court chose to balance the competing interests before determining the applicable limitations period. We also believe that the enforcement of the grievance and arbitration procedures contained in the collective bargaining agreement is an important objective. We can see why the union sought to delay arbitration until it was sure that a violation had occurred. However, once such a violation becomes clear, no one is served by lengthy delay, least of all the employees whose interests the union must protect.
 
 
 40
 In reaching its decision to apply the six-month statute to hybrid section 301 actions, the Supreme Court reasoned that most employees are unsophisticated in collective-bargaining matters. DelCostello, 462 U.S. at 166, 103 S.Ct. at 2291. Surely it would be illogical to allow the union a greater period of time than the individual employees. The union has more knowledge of the underlying dispute, and should be more capable of discerning when an agreement has been breached and litigation is necessary.
 
 
 41
 We find that the six-month statute of limitations should apply here to the union's action to compel arbitration. This action is therefore barred and this portion of the district court's opinion is reversed.
 
 
 42
 Having determined that the six-month statute of section 10(b) applies to the claim by individual employees against the company and union under section 301, we further find that both the employees' complaint and the union's cross-claim should have been dismissed by the district court.
 
 
 43
 Therefore, the judgment of the district court is affirmed in part, reversed in part and remanded with directions to dismiss.