*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0455p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

WAREHOUSE, PRODUCTION, MAINTENANCE
AND MISCELLANEOUS EMPLOYEES,
FURNITURE, PIANO AND EXPRESS DRIVERS
AND HELPERS LOCAL UNION NO. 661,
affiliated with the International Brotherhood
of Teamsters,

      *Plaintiff-Appellant,*

  *v.*

ZENITH LOGISTICS, INC.,

      *Defendant,*

THE KROGER COMPANY, KROGER LIMITED
PARTNERSHIP I,

      *Defendants-Appellees.*

No. 08-3267

> Appeal from the United States District Court
> for the Southern District of Ohio at Cincinnati.
> No. 06-00846—Michael R. Barrett, District Judge.

Argued: December 9, 2008

Decided and Filed: December 23, 2008

Before: GILMAN, SUTTON, and KETHLEDGE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Julie C. Ford, DOLL, JANSEN & FORD, Dayton, Ohio, for Appellant. Timothy P. Reilly, TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, John W. Fischer, DENLINGER, ROSENTHAL & GREENBERG, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Julie C. Ford, DOLL, JANSEN & FORD, Dayton, Ohio, for Appellant. Timothy P. Reilly, Daniel Joseph Hoying, TAFT, STETTINIUS & HOLLISTER, Cincinnati,

1

Ohio, John W. Fischer, DENLINGER, ROSENTHAL & GREENBERG, Cincinnati, Ohio, for Appellees.

_____

**OPINION**

_____

KETHLEDGE, Circuit Judge.    Warehouse, Production, Maintenance and Miscellaneous Employees, Furniture, Piano and Express Drivers and Helpers Local Union 661 ("Union") appeals the dismissal of its complaint against The Kroger Company and Kroger Limited Partnership I (collectively, "Kroger"). The complaint sought to compel Kroger's participation in an arbitration conducted pursuant to the Union's collective bargaining agreement with another company, Zenith Logistics, Inc. ("Zenith"). The district court determined the complaint was filed outside the applicable statute of limitations. We agree, and affirm.

I.

Kroger owns a warehouse in Woodlawn, Ohio. In November 1998, it leased the warehouse to Zenith, which began providing Kroger with various storage and transportation services from the warehouse. Zenith hired virtually all of Kroger's warehouse employees. Zenith also negotiated and implemented a new collective bargaining agreement between itself and the Union. Kroger was not a signatory to the agreement.

Zenith thereafter hired an outside company to do "freight dock" and salvage work at the warehouse. That work had previously been done by Union employees. In response, the Union sent grievances to both Zenith and Kroger on January 21, February 2, and April 7, 2006. The International Brotherhood of Teamsters ("Teamsters") also sent a letter to Kroger on January 30, and itself filed grievances with both Zenith and Kroger on February 21, February 23, and April 3, 2006.

On February 3, 2006, John Wagner, Kroger's Vice President of Labor Relations, sent a letter to the Teamsters with a copy to the Union, responding to both the Union's January 21 grievance and the Teamsters' January 30 letter. Wagner stated that "[i]t appears that both of these letters are addressed to the wrong party." He continued, "[m]y understanding is that

the hourly employees are employed by Zenith Logistics, and that Zenith and the Teamsters have entered into a collective bargaining agreement. Kroger is not a party to such agreement; therefore, Local 661 should direct its grievance to Zenith and not Kroger."

In response, the Teamsters acknowledged Kroger's position but requested that Kroger become involved anyway, under the terms of a separate agreement between Kroger and the Teamsters. Kroger wrote back to the Teamsters on March 2, 2006, stating that "any grievances or disputes Local 135 and 661 have with Zenith Logistics are for those unions and that employer to resolve and not for [Kroger] . . . . Kroger will not intrude in the labor relations of Zenith Logistics or any other employer[.]"

The Union next sent a letter to Kroger on April 15, 2006, enclosing a copy of its April 7 grievance, and acknowledging that "[s]o far Kroger has not participated in the grievance process with Zenith on the subcontracting grievances." The letter gave notice, however, that "[t]he Union intends to proceed with these grievances, including with regard to the joint employer issue, with or without Kroger's participation. It is the Union's position that Kroger is a party to these grievances and that it is bound by the outcome even if it chooses not to participate[.]"

Nine days later, on April 24, 2006, Kroger Vice-President Wagner responded: "Please be advised that I have already responded . . . regarding Kroger's positions of [sic] your grievances with Zenith Logistics. I am inclosing [sic] copies of both letters for you to review. Kroger's position has not changed[.]" Wagner enclosed Kroger's letters of February and March. The Union did not write back to Kroger. It later sent a formal request for arbitration only to Zenith.

On June 14, 2006, the Union filed for arbitration—the last step in the grievance process—naming both Zenith and Kroger as parties. The next day, the American Arbitration Association ("AAA") sent Kroger a letter identifying potential arbitrators for the grievance. Kroger responded by sending a letter to the Union on June 22, 2006, with a copy to the AAA. The letter stated that "since Kroger does not employ the Zenith employees and is not a party to the collective bargaining agreement at issue in this grievance, Kroger is not a proper party to the arbitration and will not participate in the arbitration."

The Union filed its complaint to compel arbitration on December 13, 2006.  Kroger moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6), on limitations grounds. The district court granted the motion.  This appeal followed.

II.

Although the district court viewed Kroger's motion as one seeking dismissal under Rule 12(b)(6), we construe it as a motion for summary judgment under Rule 56(c) because its resolution depends on matters neither included in nor referred to in the complaint.  *See Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997).  In either event, "[w]e review *de novo* a district court's determination that a complaint was filed outside the applicable statute of limitations."  *Cook v. Comm'r of Soc. Sec.*, 480 F.3d 432, 435 (6th Cir. 2007).

The parties agree that the Union's complaint to compel arbitration is subject to a six-month statute of limitations.  This period is borrowed from section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b), and rests in part on our assumption that a union, more so than an individual employee, "should be . . . capable of discerning when an agreement has been breached and litigation is necessary."  *McCreedy v. Local Union No. 971, UAW*, 809 F.2d 1232, 1239 (6th Cir. 1987).  The six-month period begins to run "when the employer takes an unequivocal position that it will not arbitrate."  *Id*. at 1237.

The issue here is when, exactly, Kroger took such a position.  The district court held that Kroger did so on April 24, 2006—the date on which Kroger responded to the Union's April 15, 2006 letter.  The Union presents several arguments in response.  The first is that Kroger's April 24 letter did not refer specifically to arbitration, and thus cannot be understood as an unequivocal refusal to arbitrate.

The context of that letter refutes the Union's argument.  By April 24, Kroger had already twice told the Teamsters and the Union—in letters dated February 3 and March 2—that it was not a party to the operative agreement and would not participate in any aspect of the grievances, presumably including arbitration.  We specifically do *not* hold that the February and March letters themselves amounted to an unequivocal refusal to arbitrate; that bar is placed high, and we mean to keep it there.  But those letters were at most only mildly

equivocal on the subject, if only because they dealt with the grievance process generally, rather than arbitration specifically. The letters are thus one relevant circumstance in determining what the Union should have understood Kroger's later correspondence to have meant.

It was the Union's own April 15 letter that dealt specifically with arbitration. That letter declared the Union's intention to "proceed with these grievances . . . with or without Kroger's participation." It also stated the Union's belief that "*the evidence will show* that Kroger is a joint employer with Zenith," even though "[s]o far Kroger has not participated in the grievance process[.]" (Emphasis added.) Unlike arbitration, none of the other grievance procedures, as described in the collective bargaining agreement, mention the submission of evidence.

More importantly, the letter stated "the Union's position that Kroger is a party to these grievances and that it is *bound by the outcome* even if it chooses not to participate[.]" (Emphasis added.) The only grievance procedure that could "*bind*" Kroger is arbitration. *See* Agreement between Truck Drivers, Chauffeurs and Helpers Local Union No. 661 and Zenith Logistics, Inc., Article 25 ("[t]he decision of the arbitrator shall be binding on the Employer, the Union, and the grievant").

The Union's April 15 letter thus narrowed the Union's focus from grievance procedures generally, to arbitration specifically. And Kroger's April 24 letter in response—which was nothing if not unequivocal—made clear that Kroger would have nothing to do with it. At that point, there remained no equivocation as to Kroger's position with respect to arbitration. That Kroger did not use the word "arbitration" in its April 25 letter is—under the circumstances of this case—immaterial. *See In re Diamond D Constr. Corp.*, 15 F. Supp. 2d 274, 289 (W.D.N.Y. 1998) ("the unequivocal refusal standard does not turn on whether the party resisting arbitration has . . . uttered the magic words 'we refuse to arbitrate this dispute'"). What matters is that, by any reasonable measure, the Union should have understood Kroger's April 24 response to be an unequivocal refusal to arbitrate.

The Union next argues that Kroger could not have unequivocally refused arbitration before May 19, 2006, because the Union did not formally request arbitration until then. Our published caselaw, however, does not make a formal request to arbitrate a prerequisite to the

commencement of the limitations period. In *McCreedy*, for example, we held that the limitations period began when the employer unequivocally denied the employees' grievances, even though the union had never sent the employer a formal request for arbitration. 809 F.2d at 1237.[1]

The focus is thus on the employer's position, not the Union's conduct. There are good reasons for that focus. Theoretically, under the Union's approach, even if the employer states that, "under no circumstances, ever, will we arbitrate this dispute," the Union could still prevent the commencement of the limitations period, and thus prolong the dispute, merely by withholding a formal request. *See Aluminum, Brick & Glass Workers Int'l Union, AFL-CIO, CLC v. General Refractories Co.*, No. 94-6139, 1995 WL 283771, at *3 (6th Cir. May 10, 1995) ("a limitations period could be extended indefinitely simply by making an untimely request for arbitration"). That would only stultify the statute. This case illustrates the point: the Union sent its formal request for arbitration only to Zenith, without even a copy to Kroger; so by the Union's reasoning, the limitations period for its claim against Kroger would not have commenced even now.

Thus, what is required is not "rejection" of a union's formal request, but *refusal* to arbitrate. *See Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006) (the limitations period commences when the employer "unequivocally communicate[s] its refusal to arbitrate"). And an employer can make such a refusal clear enough even in advance of a formal request.

Finally, the Union contends that Kroger's refusal to arbitrate was unclear because certain of Kroger's communications, including its letter of February 3, were directed to the Teamsters, with only a copy to the Union. Whether the Union was identified on the "to" or the "cc" line of the relevant correspondence, however, is immaterial under the

---

[1] Our unpublished decision in *Pace Int'l Union AFL-CIO v. Vacumet Paper Metalizing Corp.*, 91 F. App'x 380, 382 (6th. Cir. 2004), is not to the contrary. There, an employer's refusal to arbitrate could not have been unequivocal, and in context was premature, because it depended on a premise that was still in doubt (namely, whether the employee had waived his right to arbitration). *Id.* Absent some clearer statement by the employer as to the basis for its argument, the employer's refusal was not unequivocal. Here, nothing further was needed for the Union to know that Kroger had no intention of arbitrating the Union's claim, since there was no question that the claim arose under an agreement to which Kroger asserted it was not a party and under which Kroger insisted it had no direct or indirect obligations. Whether or not Kroger was correct in its assertion, its position was unequivocal.

circumstances of this case.  What counts is that the Union received Kroger's letters, and that the letters made clear, no later than April 24, 2006, that Kroger would not participate in arbitration.

Consequently, the limitations period for the Union's claim to compel arbitration began to run on that date.  The Union filed its complaint more than six months later, on December 13, 2006.  The complaint was therefore untimely.

### III.

For these reasons, we affirm the judgment of the district court.