**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STEEL, PAPER AND
FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED-
INDUSTRIAL & SERVICE WORKERS
INTERNATIONAL UNION AFL-
CIO/CLC; LOCAL NO. 850L,

            *Plaintiffs-Appellees,*

        v.

CONTINENTAL TIRE NORTH AMERICA,
INCORPORATED; CTNA HEALTH
PLAN, Health Plan, Pension Plan
for Hourly-Paid Employees of
Continental General Tire, Inc. and
Certain Affiliated Companies;
PENSION PLAN FOR HOURLY-PAID
EMPLOYEES OF CONTINENTAL
GENERAL TIRE, INCORPORATED AND
CERTAIN AFFILIATED COMPANIES,

            *Defendants-Appellants.*

No. 08-1778

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
David C. Keesler, Magistrate Judge.
(3:07-cv-00074-DCK)

Argued: May 13, 2009

Decided: June 9, 2009

Before WILKINSON, MICHAEL, and MOTZ,
Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Michael and Judge Motz joined.

## COUNSEL

**ARGUED:** Brian J. Murray, JONES DAY, Chicago, Illinois, for Appellants. Joseph P. Stuligross, UNITED STEEL-WORKERS OF AMERICA, Pittsburgh, Pennsylvania, for Appellees. **ON BRIEF:** Brian West Easley, Brent D. Knight, JONES DAY, Chicago, Illinois, for Appellants. Amanda Green, Assistant General Counsel, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial and Service Workers International Union, AFL-CIO/CLC, Pittsburgh, Pennsylvania; Michael G. Okun, PATTERSON HARKAVY, LLP, Raleigh, North Carolina, for Appellees.

## OPINION

WILKINSON, Circuit Judge:

In this case, a union is seeking to compel arbitration of grievances it filed against an employer. The district court held that the grievances were arbitrable, and we affirm. The suit was timely because the statute of limitations period does not begin until a party unequivocally refuses to arbitrate. In addition, despite the fact that the grievances were filed after the collective bargaining agreements had expired, it is clear from the contracts themselves that the parties intended to arbitrate their differences.

### I.

This suit involves a dispute over pension and health insurance benefits. The defendants are Continental Tire North America, Inc. (a tire manufacturer and distributor), CTNA

Health Plan, the Pension Plan for Hourly-Paid Employees of Continental General Tire, Inc., and certain affiliated companies (collectively, "CTNA"). The plaintiffs are a group of unions: the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial and Service Workers International Union, AFL-CIO/CLC, and its Local Union No. 850L (collectively, the "Union"). The Union was the representative for bargaining unit employees at CTNA's tiremaking facility in Charlotte, North Carolina (the "Charlotte Plant").

On September 20, 1999, CTNA and the Union entered into two cross-referencing agreements that are at the center of this case: a collective bargaining agreement governing terms and conditions of employment (the "CBA") and an agreement governing pension and insurance benefits (the "P&I Agreement"). In addition to providing substantive terms and conditions of employment, the CBA outlines a broadly applicable grievance procedure. It states:

> The parties mutually agree that the procedure set forth herein is the proper vehicle for the settlement of any and all disputes arising between the parties during the life of said Agreement, unless specifically excluded by the parties, shall be submitted and settled in accordance with the following procedure without resorting to any other action.

CBA, Art. IV, ¶ 401. It then delineates a multi-step grievance procedure that culminates with an option for arbitration. It provides that "[t]he decision of the arbitrator shall be final and binding upon both parties." CBA, Art. IV, ¶ 419.

The P&I Agreement provides the substantive pension and health insurance benefits that are the subject of the Union's grievances, and it incorporates the CBA's grievance procedure in three separate places. It provides generally that "[t]his agreement shall be subject to the terms and provisions of the

grievance procedure as outlined in Article IV of the Collective Bargaining Agreement in accordance with the applicable laws." P&I Agreement, Art. IV, ¶ 8.

In addition, with respect to pension benefits, it provides specifically that the CBA grievance procedure shall be used to resolve disputes over certain issues, including "the amount of pension or other benefit to which an Employee or Pensioner is entitled under this Agreement." *Id.* at Art. I, § VI, ¶ 1. With respect to health insurance benefits, it provides specifically that "[i]n the event any dispute shall arise based on the question whether the Company has provided the insurance benefits hereinabove described, such dispute shall be subject to the grievance procedure of the Labor Agreement including arbitration." *Id.* at Art. III, § III, ¶ F. Following each of these two specific provisions providing for arbitration, the P&I Agreement also states: "Termination of the Labor Agreement shall not invalidate the use of its grievance procedure for the purposes of this paragraph." *Id.* at Art. I, § VI, ¶ 1; *id.* at Art. III, § III, ¶ F.

With respect to duration and termination more generally, the P&I Agreement explicitly states that it and the CBA expire on April 30, 2006. P&I Agreement, Art. IV, ¶ 5. It also provides, however, that "[n]otwithstanding the termination of the Agreement for Pension, Service Award, Insurance and Supplemental Workers' Compensation Benefits, the benefits described herein shall be provided for ninety (90) days following termination." *Id.*

Before the agreements were set to expire on April 30, 2006, CTNA notified the Union that it needed to reduce costs at the Charlotte Plant and attempted to renegotiate the agreements in order to achieve the necessary reductions. These negotiations were not successful, and so CTNA announced that it would have to cut production and lay off employees. Between March and July 2006, CTNA laid off over 900 bargaining unit employees from the Charlotte Plant. The CBA and the P&I

Agreement expired on April 30, 2006, in the midst of these layoffs. On May 1, 2006, CTNA unilaterally implemented the terms of its Last, Best, and Final Proposal (the "Implemented Terms"), which were later upheld by the NLRB. In contrast to the CBA and the P&I Agreement, the Implemented Terms did not provide for arbitration.

Based on the large-scale layoffs, on August 9, 2006, the Union filed two grievances with CTNA. In Grievance No. 2006-580-25, the Union alleged that CTNA violated Article III, § III, ¶ H of the P&I Agreement because it did not provide the 24 months of extended health insurance benefits that it was required to under that section. In Grievance No. 2006-580-26, the Union alleged that CTNA violated Article I, § IX, ¶ 4(a) and 5(a) of the P&I Agreement, which provided for accelerated distributions of pensions, because it did not provide the "contractually required amount of pension to which employee Arnold Hoffstetler and other employees are entitled as a result of the permanent discontinuance of tire making operations."

After CTNA refused to arbitrate the grievances, on February 14, 2007, the Union filed this suit under § 301 of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 185. The Union sought to compel arbitration under the CBA and the P&I Agreement, and, in the alternative, claimed that CTNA breached the P&I Agreement in violation of § 301 of the LMRA. Both parties filed motions for summary judgment on the count to compel arbitration. The district court granted the Union's motion and dismissed its remaining claims without prejudice. CTNA appeals.

## II.

CTNA first argues that this suit is time barred. It contends that, as many courts have held, the six-month statute of limitations from § 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b), governs this suit to compel arbitration under

§ 301 of the LMRA, 29 U.S.C. § 185. *See, e.g.*, *Aluminum, Brick and Glassworkers International Union Local 674 v. A.P. Green Refractories, Inc.*, 895 F.2d 1053, 1054-55 (5th Cir. 1990) (collecting cases). Applying this six-month statute of limitations, it asserts that the limitations period began on August 9, 2006, when Rick Schultheiss, CTNA's Human Resources Manager for the Charlotte Plant, orally informed the Union that CTNA would not arbitrate, and thus the six months had expired when the Union filed this suit on February 14, 2007 (six months and five days later). Assuming that the six-month statute of limitations applies, we reject this argument because Schultheiss's statement did not commence the statute of limitations.

As we have previously explained, when a union demands arbitration and the employer expressly refuses, "a cause of action to compel arbitration accrues, and the limitations period begins, with the refusal to arbitrate." *Local 1422, International Longshoremen's Association v. South Carolina Stevedores Association*, 170 F.3d 407, 409 (4th Cir. 1999). There is a question as to whether a formal demand for arbitration is always necessary to begin the limitations period. *See Warehouse, Production, Maintenance and Miscellaneous Employees, Furniture, Piano and Express Drivers and Helpers Local Union No. 661 v. Zenith Logistics, Inc.*, 550 F.3d 589, 593 (6th Cir. 2008) (holding that a formal demand is not required). We need not decide that question, however, because Schultheiss's statement does not satisfy the well-settled requirement that a party must *unequivocally* refuse to arbitrate before the limitations period begins. *See, e.g., Zenith Logistics*, 550 F.3d at 592 ("The six-month period begins to run 'when the employer takes an unequivocal position that it will not arbitrate.'" (quoting *McCreedy v. Local Union No. 971, UAW*, 809 F.2d 1232, 1237 (6th Cir. 1987))); *Local Joint Executive Bd. of Las Vegas, Bartenders Union Local 165, Culinary Workers' Local Union No. 226 v. Exber, Inc.*, 994 F.2d 674, 676 (9th Cir. 1993); *A.P. Green Refractories*, 895 F.2d at

1055; *Niro v. Fearn Int'l, Inc.*, 827 F.2d 173, 177-78 (7th Cir. 1987).

According to Schultheiss's sparse affidavit, on August 9, 2006, upon receiving the Union's grievances, he informed the Union representative "that it was CTNA's position that the grievances were not arbitrable under the current grievance procedure" and that he would "give the grievances to Rick Ledsinger, CTNA's Vice President, Human Resources for a written response."

This statement is far from unequivocal. By stating that he would give the grievances to a superior human resources officer at CTNA, Schultheiss suggested that his decision would be subject to further review. This gave the Union good reason to doubt that Schultheiss had the authority to finally resolve the issue. Furthermore, by stating that a written response would be forthcoming, Schultheiss implied that an oral response alone was too informal to end the matter and that Ledsinger's written response was necessary to finalize the decision.

In addition, by stating that the grievances were not arbitrable under the "current grievance procedure," Schultheiss suggested that he was expressing an opinion only as to whether arbitration was required by the grievance procedure in CTNA's recently imposed Implemented Terms, and not an opinion as to whether it was required by the prior P&I Agreement. Schultheiss's failure to address whether CTNA would refuse to arbitrate grievances covered, as the Union believed its grievances were, by the P&I Agreement left open that question as well as the possibility for further discussions.

For various reasons, therefore, Schultheiss's statement did not "make clear" that CTNA had "made a *final* decision refusing to arbitrate." *Niro*, 827 F.2d at 177-78. A refusal to arbitrate must be unequivocal so that it puts the other party on notice that the statute of limitations period has begun. The

cagily worded statement in Schultheiss's affidavit simply did not put the Union on notice that CTNA would not arbitrate the dispute and that consequently the Union would have to file suit to compel arbitration within the applicable limitations period.

We conclude, therefore, that the limitations period did not begin with Schultheiss's statement on August 9, 2006, as CTNA contends. Regardless of whether it began on August 16 with Ledsinger's written refusal to arbitrate or only after August 17 when the Union formally demanded arbitration, the February 14, 2007 filing date for this complaint was within the six-month limitations period.

### III.

CTNA next argues that the Union's action to compel arbitration fails on the merits. Specifically, CTNA contends that it is not obligated to arbitrate the grievances under the CBA and the P&I Agreement because the agreements do not provide for arbitration of the particular grievances at issue here, and, in any event, they were no longer in force when the grievances were filed.

CTNA is of course correct that the obligation to arbitrate is strictly contractual. The Supreme Court has repeatedly emphasized "that arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648 (1986) (internal quotation marks omitted). *See also Nolde Bros., Inc. v. Local No. 358, Bakery and Confectionery Workers Union*, 430 U.S. 243, 250-51 (1977) (noting prior cases holding that "a party cannot be compelled to arbitrate any matter in the absence of a contractual obligation to do so"); *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 374 (1974) ("The law compels a party to submit his grievance to arbitration only if he has contracted to do so.").

In *Nolde Bros.*, the Court explained that "[a]dherence to these principles, however, does not require us to hold that termination of a collective-bargaining agreement automatically extinguishes a party's duty to arbitrate grievances arising under the contract." 430 U.S. at 251. But this question of continuing arbitration obligations is, like so much else in this area, a matter of basic contract law. In fact, grievances filed after a contract expires are only arbitrable when they "arise under the contract." *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 205-06 (1991). The Court went on to explain:

> A postexpiration grievance can be said to arise under the contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.

*Id.* These various theories are all getting at the same question: "whether the parties agreed to arbitrate *this* dispute." *Id.* at 209 (emphasis added).

Here, we have little trouble concluding that they did. Multiple provisions of the contracts support that view. The parties not only provided for arbitration broadly during the life of the CBA and the P&I Agreement, *see* CBA, Art. IV, ¶ 401; P&I Agreement, Art. IV, ¶ 8. They also explicitly agreed that the arbitration procedure outlined in the CBA would survive the expiration of the CBA for use in resolving disputes over pension and health insurance benefits. In the article governing the pension plan, the P&I Agreement states that the CBA grievance procedure shall be used to resolve disputes over "the amount of pension" and then states: "Termination of the Labor Agreement shall not invalidate the use of its grievance procedure for the purposes of this paragraph." P&I Agreement, Art. I, § VI, ¶ 1. Similarly, in the article governing

health insurance, the P&I Agreement states that the CBA grievance procedure shall be used to resolve disputes about "whether the Company has provided the insurance benefits hereinabove described" and then states: "Termination of the Labor Agreement shall not invalidate the use of its grievance procedure for the purposes of this Section." *Id.* at Art. III, § III, ¶ F. These provisions show that the parties intended to arbitrate disputes over pension and health insurance benefits, such as the ones at issue in this case, after the date that the CBA and the P&I Agreement were set to jointly expire.

CTNA alleges that the specific arbitration provision governing health benefits does not apply to the Union's claim for extended health insurance benefits because the provision addresses "benefits *hereinabove* described" and the basis of the Union's claim falls below the provision. Even leaving aside the question of whether this argument was ever raised with anything approaching the requisite specificity in the court below, the one word upon which CTNA fastens is hardly sufficient to counteract the great weight of contractual provisions to the contrary or the Supreme Court's admonition in *Litton* that even in cases of postexpiration arbitration, "doubts should be resolved in favor of coverage." 501 U.S. at 209.

In addition, the parties agreed that "[n]otwithstanding the termination of the Agreement for Pension, Service Award, Insurance and Supplemental Workers' Compensation Benefits, the benefits described herein shall be provided for ninety (90) days following termination." P&I Agreement, Art. IV, ¶ 5. When this is read in combination with the general arbitration clauses, *see* CBA, Art. IV, ¶ 401; P&I Agreement, Art. IV, ¶ 8, and the specific arbitration clauses described above, *see* P&I Agreement, Art. I, § VI, ¶ 1; *id.* at Art. III, § III, ¶ F, it is clear that the parties agreed to arbitrate disputes over pension and health insurance benefits that might arise during the 90 days of extended coverage. The Union's grievances fall squarely within this category: one claim is for accelerated

pension benefits, the other is for extended health insurance coverage, and both are based on layoffs that occurred during the 90 day extended benefits period.

As the Court said in *Litton*, "if a collective-bargaining agreement provides in explicit terms that certain benefits continue after the agreement's expiration, disputes as to such continuing benefits may be found to arise under the agreement, and so become subject to the contract's arbitration provisions." 501 U.S. at 207-08. Whether the parties provided for arbitration generally or specifically makes no difference in this instance. All of the contractual roads here lead to Rome, with Rome in this case being arbitrability. In fact, were we to hold that under this contract the commitment to arbitrate terminated on the very day the collective bargaining agreement expired, we would be embracing the untenable proposition that arbitration obligations could seldom outlive the collective bargaining agreements in which they were embodied. But any such notion is at odds with the parties' freedom to contract for dispute resolution mechanisms of a duration the parties themselves would prefer.

Questions beyond this are for the arbitrator to decide on the merits. For example, CTNA contends that the clause providing for arbitration of disputes over "the amount of pension" benefits, P&I Agreement, Art. I, § VI, ¶ 1, does not apply to the Union's claim for accelerated pension benefits because that claim has only to do with form and timing, not the underlying amount due, which CTNA allegedly does not dispute. The question of whether the acceleration provision increases the amount of benefits above the level that CTNA concedes it owes, however, draws us too far into the arbitrator's role of deciding the merits of the claim.

To be sure, courts are permitted some latitude to interpret provisions of a bargaining agreement that impact the underlying merits of the dispute when it is necessary to determine whether the parties agreed to arbitrate the dispute. *See Litton*,

501 U.S. at 208-09. If possible, however, the underlying merits should be avoided, so that we do not take on the role that the parties have assigned to the arbitrator. *See AT&T Technologies*, 475 U.S. at 649 (noting prior cases holding that "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims"); *Cumberland Typographical Union No. 244 v. Times and Alleganian Co.*, 943 F.2d 401, 404 (4th Cir. 1991). Because the parties' clearly intended to arbitrate the grievances at issue here, we need not, and indeed may not, ourselves take up the merits.

## IV.

Courts in this area must navigate between two poles. On the one hand, we may not impose upon any party an arbitration obligation to which it has not consented. *See, e.g.*, *Nolde Bros.*, 430 U.S. at 250-51. By the same token, we are also obliged not to permit a party to wiggle out of an obligation to which it has agreed. The contracts make plain that the latter danger in this case is the one that needs to be averted. The district court recognized as much and its judgment is affirmed.

*AFFIRMED*